# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

DURANGO-GEORGIA PAPER CO.;　　*
DURANGO-GEORGIA CONVERTING　　*
CORP.; and DURANGO-GEORGIA　　*
CONVERTING, LLC; BY AND　　*
THROUGH BRIDGE ASSOCIATES, LLC,　*
AS LIQUIDATING TRUSTEE OF THEIR　*
BANKRUPTCY ESTATES AND AS　　*
ADMINISTRATOR OF THE DURANGO-　*
GEORGIA PAPER COMPANY PENSION　*
PLAN FOR HOURLY EMPLOYEES,　　*
　　　　*
　　Plaintiffs,　　*
　　　　*
　　v.　　*　　　CV 207-122
　　　　*
H.G. ESTATE, LLC; THE HOWARD　*
GILMAN FOUNDATION, INC., f/k/a　*
GILMAN INVESTMENT COMPANY,　*
f/k/a GILMAN PAPER COMPANY;　*
W.O. CORPORATION; GILMAN　*
BUILDING PRODUCTS COMPANY;　*
GILMAN BUILDING PRODUCTS, LLC;　*
and MAXVILLE CORPORATION　*
　　　　*
　　Defendants.　　*

---

**O R D E R**

---

On September 30, 2010, Defendants H.G. Estate, LLC, the
Howard Gilman Foundation, Inc., and W.O. Corporation ("Pension
Defendants") filed a motion to dismiss the "pension-related"
claim set forth in what is styled as "Plaintiffs' Third Amended

Complaint."[1]    (Doc. no. 48.)    Concurrently therewith, the remaining Defendants, Gilman Building Products Company, Gilman Building Products LLC, and Maxville Corporation ("Non-Pension Defendants"), filed their own motion seeking to dismiss Plaintiffs' Third Amended Complaint or, in the alternative, to clarify the procedural posture of the case going forward.    (Doc. no. 49.)    For the reasons stated herein, Defendants' motions are **GRANTED** to the extent set forth in this Order.

## I. BACKGROUND

### A. History of the Gilman Paper Company and the Pension Fund

The following facts are taken from the Complaint filed by Plaintiffs.    Gilman Paper Company owned and operated a paper mill in St. Marys, Georgia.    The company established a pension plan ("Pension Plan") for its hourly employees in approximately 1960.    The Pension Plan was maintained without interruption until the St. Marys paper mill ("Mill") closed in 2002.

The Howard Gilman Foundation was incorporated in 1981 by Mr. Howard Gilman, who, at that time, owned one-hundred percent of the corporation's stock.    In 1988, Gilman Investment Company was incorporated as a wholly-owned subsidiary of the Howard Gilman Foundation.    Gilman Investment Company was created for the purpose of consolidating the capitalization, financing, and

---

[1] Pension Defendants contend "Plaintiffs' Third Amended Complaint" is in fact the sixth complaint filed in this action.    (See Doc. no. 48 at 3.)

accounting functions of Mr. Gilman's various business interests. The Gilman Paper Company became a wholly-owned subsidiary of Gilman Investment Company, and the Mill remained an unincorporated operating division of Gilman Paper Company.

Until 1996, Gilman Investment Company controlled all cash generated by the Mill and paid the Mill's current obligations, including the funding of the Pension Plan. The profits from the Mill were also used to support other Gilman interests. During the 1990s, the Mill became legally insolvent according to its balance sheets. During this time, Gilman Investment Company continued to pay the bills of the Mill.

In January 1998, Mr. Gilman died. At that time, Gilman Investment Company owned and operated four principal subsidiaries and divisions, with holdings that included two lumber mills, a railroad, three converting plants, the Mill, Gilman Building Products, and other ventures. At the time of Mr. Gilman's death, Gilman Building Products was the only Gilman business making money. Consequently, money from Gilman Building Products was used to fund the remaining Gilman businesses, including Gilman Paper Company.

Mr. Gilman's will directed the executors of his estate to maintain control over the operation and management of the Gilman businesses and to sell the businesses under certain terms and

conditions. A year after Mr. Gilman's death, the Gilman businesses restructured and collapsed several corporate layers.[2]

Upon restructuring, H.G. Estate, LLC, was organized to take the place of the now-defunct Gilman Investment Company. H.G. Estate owned St. Marys Railroad, LLC, and the New Gilman Paper Company, the entity that owned the Mill. H.G. Estate also owned Converting Corporation, which in turn owned the membership interest in Converting, LLC. Another H.G. Estate subsidiary was W.O. Corporation, which was the Gilman company that held and administered the Mill's Pension Plan. H.G. Estate continued to pay the current bills for the H.G. Estate subsidiaries, but did not fund any long-term or contingent obligations, including, but not limited to, the Pension Plan and maintenance of the Mill.

*1. Sale of the Paper Mill*

In 1999, H.G. Estate, the Foundation, W.O. Corporation, Gilman Building Products Company, and other related Gilman enterprises approached Banc of America Securities, LLC, ("BOAS"), a national mergers and acquisitions firm, to assist in the marketing and sale of the paper mill located in St. Marys, Georgia, and its related paper marketing and distribution

---

[2] Plaintiffs allege that this restructuring was designed "to facilitate the administration of Mr. Gilman's estate and insulate the Gilman assets from state and federal estate and capital gains taxes, from continuing losses and from ongoing Pension Plan obligations." (Compl. ¶ 74.)

business. A principal broker assigned responsibility for the marketing effort to Nicholas V. Beare.

In preparation for the marketing of the paper mill, Beare and other representatives of BOAS had several conversations with Gilman representatives, including Bernard D. Bergreen, Steven M. Cropper, William "Bill" Davis, and Natalie P. Moody. On at least one occasion, Beare met Bill Davis for lunch. At the time, Bill Davis was serving as President and/or Chief Operating Officer of the paper mill. Plaintiffs allege that during this meeting Davis indicated that the paper mill was being sold, in part, because of the pension plan.

On December 17, 1999, Durango Paper Company acquired the New Gilman Paper Company, including the Mill, its affiliated companies, its converting plants, and the assets of the railroad, for $119.5 million in a stock purchase transaction. Thereafter, the names of certain entities were changed: the New Gilman Paper Company became Durango-Georgia Paper Company; Converting Corporation became Durango-Georgia Converting Corporation; and Converting, LLC, became Durango-Georgia Converting, LLC. These three entities are all Plaintiffs in this case.

## B. The Bankruptcy

On October 29, 2002, various creditors filed an involuntary bankruptcy petition against Durango-Georgia Paper Company under Chapter 7 of Title 11 of the United States Code. On November 20, 2002, Durango-Georgia Paper Company successfully moved for conversion of the case to one under Chapter 11. In re Durango Georgia Paper Co., Chapter 11 Case No. 02-21669, Doc. No. 30 (Bankr. S.D. Ga. Nov. 20, 2002). On November 19, 2002, Durango-Georgia Converting Corporation and Durango-Georgia Converting, LLC, filed voluntary petitions for relief under Chapter 11. In re Durango Georgia Converting Corp., Chapter 11 Case No. 02-21841 (Bankr. S.D. Ga. Nov. 19, 2002); In re Durango Georgia Converting, LLC, Chapter 11 Case No. 02-21840 (Bankr. S.D. Ga. Nov. 19, 2002).

The Chapter 11 plan and confirmation order entered on June 25, 2004, substantively consolidated Durango-Georgia Paper Company, Durango-Georgia Converting Corporation, and Durango-Georgia Converting, LLC, as well as their estates. In re Durango, Chapter 11 Case No. 02-21669, Doc. No. 963 (Bankr. S.D. Ga. filed June 25, 2004). These entities and their bankruptcy estates continue in existence under the direction and control of the Chapter 11 bankruptcy Trustee.

The Pension Benefit Guarantee Corporation ("PBGC") has filed two proofs of claims in Plaintiffs' bankruptcy case due to

underfunded pension liabilities.[3] In re Durango, Chapter 11 Case No. 02-21669, Doc. No. 2493 (Bankr. S.D. Ga. filed July 12, 2007). PBGC is a federal corporation created pursuant to the Employee Retirement Income Security Act ("ERISA"). See 29 U.S.C. § 1302. PBGC administers and enforces the termination insurance program created under Title IV of ERISA, which protects an employee's interest in accrued benefit rights when a defined benefits pension plan fails or terminates with insufficient funds. Connolly v. Pension Benefit Guar. Corp., 631 F. Supp. 640, 643 (C.D. Cal. 1984).

## C. ERISA Claims Against Defendants

Plaintiffs filed this suit against Defendants in the Bankruptcy Court as an adversary proceeding (the "Adversary Proceeding.) Durango v. H.G. Estate, LLC (In re Durango), No. 04-02275 (Bankr. S.D. Ga. Nov. 18, 2004). Defendants are the previous corporate owners of the bankrupt companies. Plaintiffs assert that Defendants sold the Mill with the principal purpose

---

[3] PBGC also filed suit against Plaintiffs in this Court to determine the Pension Plan termination date. Pension Benefit Guar. Corp. v. Durango, No. 2:05-cv-153 (S.D. Ga. July 25, 2005). PBGC and Plaintiffs negotiated and executed an agreement terminating the Pension Plan effective March 1, 2004, and dismissing the case. Pension Benefit Guar. Corp. v. Durango, No. 2:05-cv-153, Doc. No. 63 (S.D. Ga. Dec. 20, 2006). Defendants intervened in that case but were unsuccessful in blocking the settlement between PBGC and Plaintiffs. Defendants appealed the order setting the Pension Plan termination date and dismissing the case. However, the appeal was unsuccessful and the District Court's order was affirmed by the Eleventh Circuit. Pension Benefit Guar. Corp. v. Durango, No. 2:05-cv-153, Doc. No. 70 (S.D. Ga. Dec. 17, 2007).

of evading present and future pension plan liabilities and contend Defendants should be held liable for pension plan underfunding pursuant to §§ 1362 and 1369 of ERISA. Additionally, Plaintiffs have alleged that they are entitled to equitable relief under § 1370 for Defendants' violations of § 1369.

Defendants moved to dismiss these claims, and the Bankruptcy Court recommended that this Court remove the reference as to these claims and submitted a report and recommendation within which it recommended dismissal of Plaintiffs' claims arising under 29 U.S.C. §§ 1362, 1369, and 1370. (Doc. no. 1.) The Bankruptcy Court concluded dismissal of the claims was proper for the following reasons: (1) the Trustee had no standing under § 1362 or § 1369; (2) Plaintiffs failed to allege sufficient facts to support a claim under § 1369; (3) the Trustee did not state a claim under § 1370 because the remedy sought was not equitable in nature; (4) the Trustee had no claim under § 1370 because any such claim was not ripe; and (5) even if amendment of the Complaint were allowed, the resulting claim would be too speculative.

Plaintiffs timely filed objections to the Bankruptcy Court's Report and Recommendation. (Doc. no. 2.) Upon due consideration, the Court overruled Plaintiffs' objections as to the portion of the Bankruptcy Court's order addressing

Plaintiffs' standing under §§ 1362 & 1369 and sustained the objections pertaining to § 1370. (Doc. no. 40.) In light of its decision to sustain some of Plaintiffs' objections, the Court granted Plaintiffs leave to amend their Second Amended Complaint in order to allow them an opportunity to do the following: (1) assert additional factual allegations in support of their allegation Defendants entered into business transactions with the intent to evade pension obligations and (2) clarify the equitable relief requested.

Plaintiffs submitted their Third Amended Complaint on August 18, 2010. (Doc. no. 43.) Pension Defendants attack this most-recently filed complaint by asserting that Plaintiffs have merely disguised their prior claims for monetary damages as equitable relief, an act that Pension Defendants contend is prohibited by Supreme Court precedent. (Doc. no. 48, at 8.) Moreover, Pension Defendants argue Plaintiffs' "claims for equitable relief" are not available here. Pension Defendants further request that the Court dismiss the pension-related claim and remand this case to the Bankruptcy Court for continued prosecution of the Second Amended Complaint. (Id. at 11-12.)

Concurrently with Pension Defendants' motion to dismiss, Non-Pension Defendants challenged the Complaint alleging that several of the claims are not properly before this Court. (Doc. no. 49.) In their motion, Non-Pension Defendants assert that the six Non-Pension Claims raised in Plaintiffs' Complaint were

not withdrawn from the Bankruptcy Court nor submitted to this Court for disposition. (Id. at 5.) Instead, the Non-Pension Claims are "core" claims for which the Bankruptcy Court may enter final orders and judgments. 28 U.S.C. § 157(b)(1). As such, Non-Pension Defendants have requested that this Court dismiss the six Non-Pension Claims. (Id. at 6.) In the alternative, Non-Pension Defendants request that the Court clarify the procedural posture of this case in an effort to consolidate this lawsuit and protect the parties from potentially duplicative litigation. (Id. at 7.)

## II. MOTION TO DISMISS STANDARD

In considering a motion to dismiss under Rule 12(b)(6), the court tests the legal sufficiency of the complaint, not whether the plaintiff will ultimately prevail on the merits. Scheur v. Rhodes, 416 U.S. 232, 236 (1974). The court must accept as true all facts alleged in the complaint and construe all reasonable inferences in the light most favorable to the plaintiff. See Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002). The court, however, need not accept the complaint's legal conclusions as true, only its well-pled facts. Ashcroft v. Iqbal, 556 U.S. ---, 129 S. Ct. 1937, 1949-50 (2009).

A complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible

on its face.'" Id. at 1940 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plaintiff is required to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1940. While there is no probability requirement at the pleading stage, 550 U.S. at 556, "something beyond . . . mere possibility . . . must be alleged." Twombly, 550 U.S. at 557 (citing Durma Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005)).

### III. DISCUSSION

#### A.  Pension Defendants' Motion to Dismiss Pension-Related Claim

There are two central issues before this Court on Pension Defendants' motion to dismiss: (1) whether Plaintiffs' claims for contribution, indemnity, and exoneration, as pled in the most recent complaint, constitute "appropriate equitable relief" under 29 U.S.C. § 1370 and, if so, (2) whether Plaintiffs have sufficiently alleged they are entitled to this requested relief.

The Court turns first to the statutory language that lies at the heart of this matter, which reads as follows:

> Any person who is with respect to a single-employer plan a fiduciary, contributing sponsor, member of a contributing sponsor's controlled group, participant, or beneficiary, and is adversely affected by an act or practice of any party (other than the corporation) in violation of any provision of section 1341, 1342, 1362, 1364, 1369 of this title, or who is an employee organization representing such a participant or

11

beneficiary so adversely affected for purposes of collective bargaining with respect to such plan, may bring an action—(1) to enjoin such act or practice, or (2) **to obtain other appropriate equitable relief (A) to redress such violation or (B) to enforce such provision**.

29 U.S.C. § 1370(a) (emphasis added.)

Pension Defendants contend the language highlighted herein should be considered not to encompass the relief requested, at least with respect to Plaintiffs' claims for indemnification, exoneration, and contribution. Apparently recognizing the dearth of authority addressing this particular section of § 1370, Pension Defendants rely on two Supreme Court cases interpreting identical language contained within another section of ERISA, 29 U.S.C. § 1132. Section 1132(a)(3) provides that,

[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) *to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.*

29 U.S.C. § 1132(a)(3) (emphasis added).

In <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 255 (1993), the Supreme Court held the above-language precluded "awards for compensatory or punitive damages" even when such awards were couched in equitable terms. Although the Supreme Court recognized that the term "equitable relief" could, in some cases, be defined as "whatever relief a court of equity is

empowered to provide," it construed the term more narrowly in the ERISA context. Id. It found the phrase "equitable relief," as used in 29 U.S.C. § 1132(a)(3), included only "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." Id. The Court reasoned that Congress' use of the term "equitable" to modify "relief" evidenced an intent to refer to "*something* less than *all* relief." Id. at 259 n.8 (emphasis in original).

Several years later, in Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002), the Supreme Court revisited 29 U.S.C. § 1132(a)(3), and provided further clarification as to the meaning of "other equitable relief." In Great-West, an insurance company sought enforcement of a reimbursement provision contained within a health and welfare plan. Id. at 207. The provision at issue gave the plan a right to recover from the beneficiary any payment for benefits paid by the plan that the beneficiary was entitled to recover from a third party. Id. The defendant in Great-West was a beneficiary under the plan who received from Great-West Life & Annuity Insurance Company ("Great-West") payment for medical expenses incurred as a result of a car accident pursuant to a "stop-loss" insurance agreement with the plan. Id. The plan assigned its right to litigate any claim under the reimbursement provision to Great-

13

West, which brought suit against the beneficiary seeking "injunctive and declaratory relief under [§ 1132(a)(3)] to enforce the reimbursement provision of the Plan . . . by requiring the [defendants] to pay the Plan . . . [all] proceeds recovered from third parties." Id. at 712.

In Great-West, the Supreme Court was once again asked to ascertain whether the particular relief sought by the plaintiffs could properly be characterized as "equitable." Id. at 206. The plaintiffs argued "restitution" has typically been considered an "equitable" remedy, and thus properly could be pursued under § 1132(a)(3). Despite the plaintiffs' arguments to the contrary, the Court held that "not all relief falling under the rubric of restitution is available in equity." Id. at 212. Specifically, the Court stated that in order for restitution to lie in equity, "the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." Id. at 213.

Plaintiffs argue that Mertens and Great-West are inapplicable to the case at bar because they address an entirely different ERISA statute, and, in any event, were wrongly decided. They ask for the Court to largely ignore these decisions and apply the Supreme Court's mandated analytical guidelines for interpreting statutes. Plaintiffs contend such

14

an analysis would inevitably lead the Court to conclude that the relief requested is equitable in nature. The Court finds Plaintiffs' construction of the statute at issue persuasive. However, Plaintiffs' arguments as to the statute's purpose and meaning fail to overcome the language contained in the above-cited Supreme Court decisions and their inability to cite to a single case in which a party has been permitted to utilize § 1370 in the manner they propose.

This Court recognizes that the Supreme Court cases cited by Defendants are not directly on-point, but the Court finds them instructive nonetheless.[4] Although Mertens and Great-West deal with different ERISA statutes, they involve identical language under the same Act. Moreover, to date, no court has specifically defined "equitable relief" in the context of 29 U.S.C. § 1370, thus providing the Court with even more reason to look to this persuasive authority. Finally, this Court does not readily turn a blind eye to the decisions of this nation's highest court, especially when the issues presented are similar, and the principles applied appear relevant.

In both Mertens and Great-West, the Supreme Court emphasizes at the outset that ERISA is a "comprehensive and

---

[4] Notably, this is not the first district court to draw the connection between the ERISA language contained in 29 U.S.C. § 1370 and the Supreme Court decisions construing identical language found in § 1132. See Carlson v. Versus Principal Life Ins. Co., No. 01-cv-0581 (E.D.N.Y. Sept. 28, 2006) (applying Mertens and Great West in context of § 1370).

reticulated statute," and courts should be "'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." Great-West, 534 U.S. at 209 (citation omitted); see also Mertens, 508 U.S. at 251 (same). The Supreme Court then went on to hold, in both cases, that "appropriate equitable relief," at least as that term is used under § 1132, does not include money damages, which are considered "the classic form of *legal* relief." Mertens, 508 U.S. at 255. This rule has been held to apply equally whether a party expressly requests monetary damages or disguises such a request as one arising under equity. With regard to this final point, the Supreme Court has stated that,

> suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for "money damages," as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.

Great-West, 534 U.S. at 210 (quoting Bowen v. Massachusetts, 487 U.S. 879, 918-19 (1988)).

At its core, this is a suit for money damages in which Plaintiffs seek "compensation for loss resulting from the defendant's breach of legal duty."[5] Great-West, 534 U.S. at 210.

---

[5] Plaintiff has expressly sought monetary damages throughout this case and only removed the dollar value of its requested relief after the Court held that monetary damages were prohibited under § 1370. (See, e.g., Nov. 8, 2004 Complaint (seeking award of $45 million); First Amended Complaint ¶

16

Although Plaintiffs have gone to great lengths to incorporate "equitable" language into their complaint that originally contained a request for money damages, they have proven largely unable to provide allegations demonstrating that the actual relief sought is truly equitable in nature, as that term has been somewhat narrowly defined by the Supreme Court in the ERISA context.

Moreover, both this Court and the Bankruptcy Court have already held that the majority of Plaintiff's "equitable" claims are not permitted under 29 U.S.C. § 1370, at least as they are presented here. In its October 3, 2007 Report and Recommendation, the Bankruptcy Court stated the following: "The Trustee insists that [the] remedy [sought] is equitable 'in the nature of exoneration, indemnity, restitution, or contribution . . . .' To the contrary, the nature of the relief sought is legal, not equitable." (Doc. no. 1 at 17.) The Court took this recommendation under advisement and ultimately held that the Bankruptcy Court's determination was correct to the extent it addressed Plaintiffs' claims for exoneration, indemnification, restitution, and contribution. (See Doc. no. 40 at 16-17 ("The Bankruptcy Court concluded that the relief requested by Plaintiffs is not equitable relief, but money

---

187(c) (seeking award of $45 million); and Second Amended Complaint ¶ 6 (seeking award of $55 million).)

damages in the amount of $55 million 'in the nature of exoneration, indemnity, restitution, or contribution . . . .' The Bankruptcy Court's Report and Recommendation is correct — the money damages sought by Plaintiffs' Second Amended Complaint do not constitute equitable relief.").)

In conclusion, the Court notes once again that Plaintiffs have failed to cite to a single case in support of their proposed application of 29 U.S.C. § 1370. Moreover, the limited legal authority that has been presented tends to indicate that Plaintiffs' claim under this statute should be barred. Based upon the facts presented and for the reasons set forth above, the Court finds Plaintiffs have failed to state a claim against the Pension Defendants and said claim should be dismissed.

**B.  Non-Pension Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint or, in the Alternative, to Clarify the Procedural Posture of the Case Going Forward**

As previously stated, Non-Pension Defendants also filed a motion to dismiss. (Doc. no. 49.) These Defendants contend that Plaintiffs have improperly raised Non-Pension Claims, which, as core claims, "have at all times remained pending before the Bankruptcy Court." (Id. at 4-5.) Accordingly, Non-Pension Defendants ask this Court to either dismiss the amendments as to the non-pension claims or clarify the

18

procedural posture of the case going forward. The Court **GRANTS** Non-Pension Defendants' Motion to the extent outlined below.

This Court previously granted Plaintiffs a limited opportunity to amend their complaint in order to clarify their equitable subordination claim. (Doc. no. 40 at 17.) This Court noted that although Plaintiffs had not clearly pled this claim, it could potentially serve as a legitimate form of equitable relief under § 1370. (Id.) Based upon Plaintiffs' most recent complaint, however, it is apparent that Count IV, the subordination claim, also fails as a matter of law. Plaintiffs' equitable subordination claim is clearly premised upon Plaintiff's demand for indemnity, exoneration, and contribution. (See Third Amended Compl. ¶ 133 ("If Defendant H.G. Estate indemnifies Plaintiff as demanded, then Defendant H.G. Estate may seek to assert such claims in the Bankruptcy Case by way of subrogation.").) Plaintiffs readily admit this in a brief,

> Equitable claim subordination under 11 U.S.C. § 510 is only one of the claims for equitable relief requested in this case. The remedy of equitable subordination is secondary to Plaintiffs being granted the broader remedies of contribution, indemnity, exoneration, or "other appropriate equitable relief." Before it may be equitably subordinated, a "claim" of Defendants must arise. Such a "claim" could only arise after Defendants actually pay a portion of the termination liability to the PBGC and seek subrogation to the PBGC against the Bankruptcy Estate. In other words, Section 510 equitable subordination is meaningless without granting other equitable relief to Plaintiffs.

(Doc. no. 62 at 2.)  Having found that Plaintiffs' claims for indemnity, exoneration, and contribution fail as a matter of law, Plaintiffs' equitable subordination claim, Count IV, must necessarily fail and is therefore dismissed.[6]

In an effort to clarify the procedural posture of this case going forward, the Court further orders that the causes of action contained in Counts I, III, V, VI, VII, VIII, IX, and X of Plaintiffs' Third Amended Complaint be severed from this action and referred to the Bankruptcy Court as part of Adversary Proceeding No. 04-02275, which remains open and pending in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court").

Moreover, the Court orders that Plaintiffs' appeal rights from such Order of the Bankruptcy Court with respect to Count I, which was previously dismissed with prejudice by that court, shall follow the Counts severed by this Order.  As a result, Plaintiffs' right to appeal from such dismissal shall run from the entry of a final order or judgment with respect to the remaining Counts of Plaintiffs' Third Amended Complaint in the Adversary Proceeding.

---

[6] It appears from Plaintiffs' Third Amended Complaint that Count IV is based, in part, on Claim No. 1461 originating in the Bankruptcy Court. (Third Amended Comp. ¶¶ 131-32.)  However, the Bankruptcy Court in its Consent Order Consolidating Various Related Contested Matters, issued on May 5, 2005, found that Proof of Claim No. 1461 was disallowed because it was duplicative of Proof of Claim No. 385. (A.P. Doc. no. 12 at 6.)  Therefore, despite this Court's dismissal of Count IV, an argument could be made that Count IV was not properly before this Court because it was previously disallowed by the Bankruptcy Court.

It is further ordered that Plaintiffs' rights to move to re-assert Count III of their Third Amended Complaint, previously dismissed without prejudice by the Bankruptcy Court because it was not ripe for adjudication, and Plaintiffs' appeal rights from such Order of the Bankruptcy Court shall follow the Counts severed from Plaintiffs' Third Amended Complaint by this Order. As a result, Plaintiffs' rights to appeal from such dismissal shall run from the entry of a final order or judgment with respect to the remaining Counts of Plaintiffs' Third Amended Complaint in the Adversary Proceeding.

Within seven (7) days from the date of the entry of this Order, Plaintiffs shall file a copy of their Third Amended Complaint, without further amendment, in the Adversary Proceeding. Plaintiffs shall also serve a copy of the Third Amended Complaint upon Defendants, and shall file a certificate of service in the Adversary Proceeding. Defendants will have thirty (30) days from the date of service to file an Answer to the remaining counts of Plaintiffs' Third Amended Complaint.

## IV. CONCLUSION

Upon the foregoing, Pension Defendants' Motion to Dismiss Pension-Related Claim (doc. no. 48) is hereby **GRANTED**. Non-Pension Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint, or in the Alternative, to Clarify the Procedural Posture of the Case Going Forward (doc. no. 49) is **GRANTED** to

the extent outlined above. Further, Plaintiffs' Motion for Status Conference Regarding Discovery (doc. no. 56) and Motion for Hearing (doc. no. 60) are **DENIED AS MOOT**. The Clerk is therefore directed to **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _29th_ day of September, 2011.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA